**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOANN JACOBS, | ) | Case No. 22-cv-4489 |
| PLAINTIFF, | ) ) | |
| v. | ) | JURY TRIAL DEMAND |
| COLLEGE OF LAKE COUNTY, | ) ) | |
| DEFENDANT. | ) ) ) ) | |

## **COMPLAINT**

**PLAINTIFF, JOANN JACOBS**, (PLAINTIFF or "MS. JACOBS") through her counsel, Jaz Park, Attorney at Law, complains against **DEFENDANT, COLLEGE OF LAKE COUNTY ("CLC")**, as follows:

## **NATURE OF THE ACTION**

1. This is an action for damages related to PLAINTIFF'S employment with COLLEGE OF LAKE COUNTY to redress DEFENDANT'S violation of PLAINTIFF'S rights as guaranteed by the Civil Rights Act of 1866, 42 U.S.C. §1981, and the Illinois ("IL) Equal Pay Act ("IEPA")(820 ILCS 112).

2. PLAINTIFF asserts claims of race discrimination under Section 1981, unequal pay discrimination under the IEPA, as well as retaliation claims under both statutes.

## JURISDICTION AND VENUE

3. This court has jurisdiction of this case pursuant to the Civil Rights Act of 1866, 42 U.S.C. §1981, and 28 U.S.C. §1331. This court has supplemental jurisdiction of the claim under the IL Equal Pay Act (820 ILCS 112) pursuant to 28 U.S.C. §1367.

4. Venue is proper pursuant to 28 U.S.C. §1391 because the claim arose in this judicial district.

## PARTIES

5. At all relevant times, PLAINTIFF worked for DEFENDANT as a full-time employee. PLAINTIFF is an "employee" within the definition of 42 U.S.C. §1981, and the IL Equal Pay Act, 820 ILCS 112/5.

6. DEFENDANT is a public community college organized under the Illinois Public Community College Act engaged in the business of providing college-level education, with its principal place of business located in Lake County, Illinois. DEFENDANT is an employer and a proper party defendant within the definitions of 42 U.S.C. §1981, and the Illinois Equal Pay Act (820 ILCS 112).

## FACTS

### A. Background

7. **PLAINTIFF, JOANN JACOBS,** is a long-term and highly-rated employee.

8. PLAINTIFF is an African-American female.

9. PLAINTIFF is a member of a protected class within the definition of Section 1981, and the IL Equal Pay Act,

10. PLAINTIFF demonstrated a history of leadership for DEFENDANT since 2005, and has served in various managerial positions.

2

11. CLC has three campuses, with each campus requiring a center for the Testing Department

12. PLAINTIFF became coordinator of the testing and tutoring centers for the Waukegan Campus. In 2013, the department roles underwent reclassification, which is when PLAINTIFF'S position title changed from "coordinator" to "manager."

13. While PLAINTIFF'S title changed at the time, she maintained the same responsibilities and classification as a "specialist."

14. The relevant classification types deployed at CLC are the "management, professional, administrator," ("administrator") versus "specialist" (non-supervisory) roles.

15. In her various roles at CLC, PLAINTIFF has been dedicated to the promotion of excellence. She received consistently positive performance reviews from her supervisors.

16. PLAINTIFF assumed the role of Manager of Testing Centers, in December, 2018.

17. However, throughout her employment, PLAINTIFF has not been properly compensated wages for her level of skills, experience, duties and responsibilities.

18. The roles in controversy here were the Manager of Testing Centers role, as well as the "Interim Manager" role of all three Testing Centers, or in effect, the "Interim Director" role, that is, the manager who had supervisory authority over all three testing centers.

### B. Mr. Gorman Received Preferential Treatment to PLAINTIFF Before the Incidents Involving Ms. Kosberg

19. PLAINTIFF, as a long term manager, possessed significantly more experience and qualifications than either Dan Gorman and Becky Kosberg.

20. Despite Mr. Gorman's and Ms. Kosberg's lesser qualifications than PLAINTIFF, they were respectively awarded with the "Interim Director" roles.

21. Mr. Gorman and Ms. Kosberg were awarded "Interim Director" roles due to their respective statuses outside of the protected categories.

22. Each was conferred with supervisory authority or responsibilities at the level of "directors," and treated as "administrators" as opposed "specialists" or "coordinators."

23. Dan Gorman, White male, began working with CLC in 2012, and quickly was appointed as the interim Director, with the departure of the prior director, Adrian Hutchinson, over PLAINTIFF and others—despite the fact that he had 7 years' less experience at CLC than PLAINTIFF, as well as significantly less qualifications for the role.

24. A search committee initially was established for the Director role. Ultimately, the role was removed, and the three managers of the testing centers reported directly to the Dean of Library and Instructional Services.

25. In 2014, Brian Beecher, White male, Dean of Library and Instructional Services, created the "Manager of Testing Centers" position for Mr. Gorman, and authorized him to continue his role as director, with the commensurate supervisory authority.

26. According to CLC personnel performance evaluation documents, Mr. Gorman was evaluated as a "management, professional, administrator," ("administrator") level employee.

27. At the time of his promotion, Mr. Gorman received a pay increase in excess of $10,000.

28. PLAINTIFF, at the time of her promotion to the Manager of Testing Center role in December, 2018, had received a minor salary adjustment, an increase of only $4,000.

**C. Ms. Kosberg is Unabashedly Slated for the Director Role in an Unlawful Exercise of Preferential Treatment**

29. Mr. Gorman provided CLC notice of his resignation in August, 2018.

4

30. After Mr. Gorman's departure, in August, 2018, a White, part-time office associate, Becky Kosberg ("Kosberg"), was appointed by Ms. Woltmann to serve as the *de facto* interim director of the testing facilities.

31. Only a few days after Gorman's notice, on August 21, 2018, PLAINTIFF made a request to Ms. Woltmann to be able to serve in an interim director capacity, in light of her seniority in the department.

32. Ms. Woltmann denied PLAINTIFF her explicit request to serve in an interim capacity on August 23, 2018.

33. In Ms. Woltmann's response, one of the reasons for the denial of PLAINTIFF'S request, was that Ms. Kosberg had already worked on a "transition plan" with Mr. Gorman, and thus, it would be easier for the them to work together.

34. PLAINTIFF also communicated her interest in applying for Mr. Gorman's role, the permanent position.

35. Part-time office associate Ms. Kosberg had 13 years' less experience at CLC than PLAINTIFF, and was without relevant experience and qualifications (ie degrees in nursing and music).

36. Ms.Woltmann, in paragraph 5 of her EEOC Affidavit (dated March 30, 2022), denied that there was an Interim Manager role.

37. Regardless, during this three month period, Ms. Kosberg's email signature read "Interim Manager;" in addition, she represented the Testing Department in staff training on CLC's Software.

38. CLC gave its deans latitude or discretion in how they provided benefits and promotional opportunities to certain employees and discouraged the advancement of other employees.

5

39. Ms. Woltmann exercised her discretion in how she provided benefits and promotional opportunities to certain employees and discouraged the advancement of other employees.

40. Ms. Woltmann had discretion in how she chose to support Ms. Kosberg's hours, efforts to become management, as well as a fulltime employee status. Ms. Kosberg was authorized by Ms. Woltmann to alternate between less and more hours to increase the number of hours worked.

41. Both Mr. Gorman and Ms. Kosberg were allowed to attend and participate in management-level committee meetings.

42. On September 14, 2018, Ms. Kosberg presented to the Testing Center team various substantive updates about CLC, alongside Ms. Woltmann, as well as members of CLC leadership from other departments. At this meeting, Ms. Kosberg shared information that no other employees were privy to in the Testing Department, including PLAINTIFF, despite her prior requests to participate.

43. One presentation matter was the new math software platform ALEKS rollout. PLAINTIFF was not previously informed of developments, and excluded from decisionmaking regarding the new math software platform.

44. Upon information and belief, Ms. Kosberg was invited to participate in several ALEKS planning meetings with the software vendor.

45. On that same day, September 14, 2018, Ms. Kosberg communicated to PLAINTIFF that she would become the new director, and that PLAINTIFF would be reporting to her.

46. In response, on that day, PLAINTIFF made a series of complaints about issues with preferential treatment of Ms. Kosberg, and the need to issue discipline. That day, Ms.

6

Woltmann met with the two to negotiate their relationship. Ms. Woltmann had consulted with HR regarding the meeting.

47. During that period, PLAINTIFF submitted a formal application for the Manager of Testing Centers role.

48. In December, 2018, PLAINTIFF became the Manager of Testing Centers. After PLAINTIFF assumed the Manager of Testing Centers role, PLAINTIFF continued to face insubordination from Ms. Kosberg.

49. Ms. Kosberg refused to return to her previous office associate position and responsibilities. She refused to perform various functions in the department.

50. Rather than provide PLAINTIFF with support for Ms. Kosberg's insubordination, or discipline the latter, Ms. Woltmann engaged in many hours to negotiate the relationship between PLAINTIFF and Ms. Kosberg-- on at least 3 separate occasions admitted in Paragraph 14 of Ms. Woltmann's EEOC Affidavit (dated March 30, 2022).

51. At no time was Ms. Kosberg disciplined for her insubordination towards PLAINTIFF, nor was she notified that she was subject to discipline as a result of these events.

52. At one of those meetings, Ms. Woltmann communicated to PLAINTIFF that she had promised Ms. Kosberg that Manager role.

53. Ms. Woltmann actively sought to procure another fulltime role for Ms. Kosberg at CLC.

54. PLAINTIFF had never previously received any such re-assurances, other encouragement, professional advising from Ms. Woltmann previously.

55. In contrast, when PLAINTIFF expressed her interest in both the interim and permanent roles in August, 2018, Ms. Woltmann did not choose to meet with PLAINTIFF, and PLAINTIFF received no positive response or opportunity to learn more about the role.

7

56. Even after PLAINTIFF'S promotion as the Manager of Testing Centers, Ms. Woltmann regularly excluded PLAINTIFF from CLC-wide and other managerial level meetings. PLAINTIFF continued to be excluded from meetings, notifications and other communications directed at CLC managers, from December, 2018 until July, 2019.

57. During the entire period, Ms. Woltmann failed to inform her that she was a member of the Leadership Council.

58. When PLAINTIFF inquired about the committee to Ms. Woltmann, she only informed PLAINTIFF that she did not need to attend the meetings and denied PLAINTIFF the option to attend said meetings.

59. Sometime before July 2019, PLAINTIFF encountered the President, Lori Suddick, in the hallway of a building on the Grayslake campus, and asked whether she should attend the meetings of the Leadership Council, administrators and managers.

60. President Suddick informed PLAINTIFF that she should have been invited to the meetings, because she was managing a team of employees.

61. As the Manager of the Testing Centers, PLAINTIFF was the sole African American, on Ms. Woltmann's leadership team, the Academic Success Committee.

**D. The Re-organization Served as an Adverse Action Intended to Reduce PLAINTIFF'S Supervisory Authority, and to Nullify PLAINTIFF'S Promotion**

62. When PLAINTIFF assumed the Manager role in December, 2018, Kathleen Scatliffe-Wallace, HR Representative, recommended that it be reviewed and reclassified as a director-level role with "administrator" status.

63. PLAINTIFF soon requested that Ms. Woltmann review the position to have it reclassified, and also requested a review of the salary level, for an increase.

64. After more than 2 years' delay, Ms. Woltmann held a brief Zoom meeting with PLAINTIFF regarding the review of her position, with executive director Human Resources, Sue Fay ("Ms. Fay"), in attendance.

65. At that meeting, PLAINTIFF was informed that she would be denied the reclassification as an "administrator," and she would remain classified as a "specialist."

66. During this meeting, Ms. Fay informed PLAINTIFF that there would be no salary increase, and that she should be happy that her $9190 health insurance stipend, which has been granted to PLAINTIFF since early in her employment, was now an official part of PLAINTIFF' salary to be counted towards her retirement.

67. In addition to PLAINTIFF'S relegation, Ms. Woltmann told PLAINTIFF that the two managers under PLAINTIFF'S authority were being downgraded from "managers" to "coordinators."

68. Ms. Woltmann explained to PLAINTIFF that the Ms. Fay was present because the update on the decision would be upsetting to PLAINTIFF.

69. Ms. Fay attended the meeting to support Ms. Woltmann.

70. Ms. Fay was not present at the meeting where the other two managers were being informed of their downgraded statuses.

9

71. Ms. Fay and Ms. Woltmann represented that the decision to reduce the classification of PLAINTIFF and the other two managers was based on "written reports."

72. Ms. Fay and Ms. Woltmann were asked to furnish copies of the "written reports" to the three managers, but these reports were never produced.

73. The re-organizations were the justifications for PLAINTIFF'S low salary and benefits levels.

74. The re-organizations were intended to deny PLAINTIFF of her proper supervisory authority, and to deny her administrative level authority.

75. The re-organizations were intended to reduce PLAINTIFF'S classification level.

### E.  Ms. Woltmann Excluded PLAINTIFF from Decisionmaking and Reduced Her Supervisory Authority

76. Despite PLAINTIFF'S manager status in title, Ms. Woltmann continued to subject Ms. Jacobs to adverse actions, which negatively impacted the terms and conditions of her employment, and resulted in her receiving less favorable/ worse treatment than other similarly situated employees.

77. The following are some examples of the ways in which PLAINTIFF was subjected to less favorable/ worse treatment than other non-African American and/or male similarly situated employees:

    a. PLAINTIFF was subjected to less pay increases and lower pay scales than others at her level of seniority, and received less benefits in relation to other employees;

    b. PLAINTIFF was never provided promotional opportunities;

    c. PLAINTIFF was subjected to a lesser performance evaluation by Ms. Woltmann without being provided a reason for the evaluation;

10

    d. PLAINTIFF was excluded from decisionmaking;

    e. PLAINTIFF, with signficant seniority and years of experience at CLC, was denied access to leadership meetings outside of her department;

    f. PLAINTIFF was bypassed by Ms. Woltmann in matters involving her employees' terms and conditions;

    g. Ms. Woltmann ultimately reduced the budget and responsibilities of PLAINTIFF'S department.

78. PLAINTIFF was offered inferior level of managerial support to PLAINTIFF, in light of the support Ms. Woltmann provided to similarly situated employees.

    a. PLAINTIFF was not supported in efforts to discipline staff, including Ms. Kosberg and Mr. Ellis;

    b. Ms. Woltmann regularly communicated updates regarding changes in terms and conditions of employment to PLAINTIFF'S employees. Ms. Woltmann denied PLAINTIFF of this information prior to their occurrences.

79. HR was aware of the adverse actions that Ms. Woltmann subjected PLAINTIFF to, but did not intervene on PLAINTIFF'S behalf.

80. HR was aware of Ms. Woltmann's efforts to bypass and reduce Ms. PLAINTIFF'S authority and did not support PLAINTIFF.

81. During the relevant period, there is additional evidence of other African American employees who have also been subjected to less favorable/ worse treatment than other non-African American and/or male similarly situated employees by DEFENDANT.

82. Other non-African American and/or male similarly situated employees were conferred benefits which positively impacted the terms and conditions of their respective employment; they received preferential treatment in their roles.

   a. Similarly situated employees received higher pay increases than PLAINTIFF, in light of their experience or lack of seniority, and received more benefits than PLAINTIFF;

   b. Similarly situated employees were provided promotional opportunities;

   c. Similarly situated employees received positive evaluations;

   d. Similarly situated employees, including Mr. Gorman and Ms. Kosberg, were aided in their supervisory and decisionmaking authority; Ms. Kosberg was allowed to represent the department in CLC-wide meetings, as well as to external vendors on several occasions;

   e. Similarly situated employees, including Ms. Kosberg were encouraged to attend leadership meetings despite non-managerial and part-time status;

   f. Similarly situated employees were not demoted or stripped of their supervisory and decisionmaking authority;

   g. Similarly situated employees were not denied the opportunities to assume director-level responsibilities during their interim roles;

   h. Similarly situated employees were not disciplined for insubordination or poor conduct towards their supervisors;

   i. Similarly situated employees were shielded by Woltmann from discipline for insubordination or poor conduct towards their supervisors.

12

83. The adverse actions PLAINTIFF was subjected to by Ms.Woltmann negatively impacted her ability to perform her job duties.

84. These multiple, overt and interrelated, actions injured PLAINTIFF, and caused her great embarrassment, humiliation, and mental and physical anguish.

## COUNT I–RACE DISCRIMINATION UNDER SECTION 1981

85. PLAINTIFF repeats and re-alleges Paragraphs 1-84 above as though fully set forth herein.

86. Section 1981 of the Civil Rights Act of 1866, as amended, prohibits employers from subjecting their employees to discrimination with respect to terms, conditions, benefits, or privileges of employment based on race.

87. Section 1981 also grants all persons within the jurisdiction of the United States the same rights to make and enforce contracts and to the full and equal benefits of the law as is enjoyed by white citizens.

88. DEFENDANT denied PLAINTIFF equal terms, conditions, benefits, or privileges of employment, because of her race.

89. PLAINTIFF'S race was a motivating factor for DEFENDANT'S conduct toward her.

90. PLAINTIFF was subjected to adverse actions under circumstances that raise a reasonable inference of unlawful discrimination.

91. DEFENDANT'S proffered reasons for subjecting PLAINTIFF to adverse actions were pretextual.

    a. DEFENDANT'S proffered reasons for the re-organization which resulted in PLAINTIFF'S and two manager's demotions, that they were based on a "written report," was pretextual.

92. By the conduct described above, DEFENDANT and its agents discriminated against PLAINTIFF in the terms and conditions of her employment because of her race.

93. DEFENDANT acted in violation of Section 1981 of the Civil Rights Act of 1866.

94. As the direct and proximate result of the DEFENDANT'S violations of Section 1981, PLAINTIFF has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss including, lost wages and lost benefits, in amounts proven at trial.

95. As the direct and proximate result of the DEFENDANT'S violations of Section 1981, PLAINTIFF has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

96. DEFENDANT'S actions were willful, intentional, and/or done maliciously or with callous disregard or reckless indifference to federally protected rights.

97. Punitive or exemplary damages are warranted to prevent similar unlawful conduct by DEFENDANT, and others.

**WHEREFORE, PLAINTIFF PRAYS IN RELIEF IN AN ORDER:**

A. Adjusting PLAINTIFF'S role to the appropriate level or classification in her department or comparable position, or, in the alternative, awarding her future pecuniary losses;

B. Ordering DEFENDANT to cease and desist from discriminating against its employees on the bases of race;

C. Awarding PLAINTIFF lost wages, incidental expenses, and the value of her lost benefits;

    D. Awarding PLAINTIFF compensatory damages;

    E. Awarding PLAINTIFF punitive damages at the maximum limit allowable by Section 1981, to deter DEFENDANT and others from like misconduct;

    F. Awarding PLAINTIFF reasonable attorney fees and costs; and

    G. Such other relief as this Court deems just and proper.

## COUNT II–RETALIATION UNDER SECTION 1981

98. PLAINTIFF repeats and re-alleges Paragraphs 1-97 above as though fully set forth herein.

99. As described above, DEFENDANT and its agents retaliated against PLAINTIFF for complaining about DEFENDANT'S discrimination against her on the basis of race.

100. DEFENDANT acted in violation of Section 1981 of the Civil Rights Act of 1866.

101. As the direct and proximate result of the DEFENDANT'S violations of Section 1981, PLAINTIFF has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss including, lost wages and lost benefits, in amounts proven at trial.

102. As the direct and proximate result of the DEFENDANT'S violations of Section 1981, PLAINTIFF has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

103. DEFENDANT'S actions were willful, intentional, and/or done maliciously or with callous disregard or reckless indifference to federally protected rights.

104. Punitive or exemplary damages are warranted to prevent similar unlawful conduct by DEFENDANT, and others.

**WHEREFORE, PLAINTIFF PRAYS IN RELIEF IN AN ORDER:**

A. Adjusting PLAINTIFF'S role to the appropriate level or classification in her department or comparable position, or, in the alternative, awarding her future pecuniary losses;

B. Ordering DEFENDANT to cease and desist from discriminating against its employees;

C. Awarding PLAINTIFF lost wages, incidental expenses, and the value of her lost benefits;

D. Awarding PLAINTIFF compensatory damages;

E. Awarding PLAINTIFF punitive damages at the maximum limit allowable by Section 1981, to deter DEFENDANT and others from like misconduct;

F. Awarding PLAINTIFF reasonable attorney fees and costs; and

Such other relief as this Court deems just and proper.

### COUNT III- ILLINOIS EQUAL PAY ACT (820 ILCS 112) UNEQUAL PAY DUE TO RACE AND SEX

105. PLAINTIFF repeats and re-alleges paragraphs 1-104, and incorporates the same by reference herein.

106. During her employment, PLAINTIFF was not properly compensated, or at a lower level, than similarly-situated non-African American employees and/or males.

107. PLAINTIFF performed work that required substantially similar skill, effort, and responsibilities as other supervisors.

108. PLAINTIFF performed work under similar working conditions.

109. None of the exceptions for unequal pay under 820 ILCS 112/10(a) are applicable.

110. In addition to overt adverse actions, PLAINTIFF was also subjected to adverse actions by DEFENDANT under circumstances that raise a reasonable inference of unlawful discrimination.

111. DEFENDANT'S proffered reasons for subjecting PLAINTIFF to adverse actions were pretextual.

112. DEFENDANT'S proffered reasons for the re-organization which resulted in PLAINTIFF'S and two manager's demotions, that they were based on a "written report," was pretextual.

113. By the conduct described above, DEFENDANT and its agents discriminated against PLAINTIFF in the terms and conditions of her employment because of her race.

114. DEFENDANT acted in violation of the IL Equal Pay Act.

115. As the direct and proximate result of the DEFENDANT'S violations of IL Equal Pay Act, PLAINTIFF has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss including, lost wages and lost benefits, in amounts proven at trial.

116. As the direct and proximate result of the DEFENDANT'S violations of IL Equal Pay Act, PLAINTIFF has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

117. DEFENDANT'S violations of the IL Equal Pay Act were willful violations in that DEFENDANT acted with intent to violate and to continue violating the IL Equal Pay Act and/or with reckless disregard for the matter of whether it was violating the IL Equal Pay Act.

118. Under 820 ILCS 112/30(a), if the employee demonstrates that the employer acted with malice or reckless indifference, punitive damages as may be appropriate.

119. For purposes of 820 ILCS 112/30, "date of the underpayment" means each time wages are underpaid.

**WHEREFORE, PLAINTIFF PRAYS IN RELIEF IN AN ORDER:**

A. Order a permanent injunction prohibiting DEFENDANT from further acts in violation of the IL Equal Pay Act;

B. Award PLAINTIFF back pay, reinstatement, compensatory damages, appropriate future earnings and reimbursement for income and fringe benefits lost to the present with applicable statutory interest;

C. Award PLAINTIFF costs of litigation, including reasonable attorneys' fees, expert fees, and expenses;

D. Award PLAINTIFF a judgment against DEFENDANT for liquidated damages as defined by the IL Equal Pay Act, and

E. Such other relief as this Court deems just and proper.

**COUNT IV–RETALIATION UNDER IL EQUAL PAY ACT (820 ILCS 112)**

120. PLAINTIFF repeats and re-alleges Paragraphs 1-119 above as though fully set forth herein.

121. As described above, DEFENDANT and its agents retaliated against PLAINTIFF for complaining about DEFENDANT'S discrimination against her on the basis of pay due to her race and gender.

122. DEFENDANT acted in violation of the IL Equal Pay Act.

123. As the direct and proximate result of the DEFENDANT'S violations of IL Equal Pay Act, PLAINTIFF has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss including, lost wages and lost benefits, in amounts proven at trial.

124. As the direct and proximate result of the DEFENDANT'S violations of IL Equal Pay Act, PLAINTIFF has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

125. DEFENDANT'S violations of the IL Equal Pay Act were willful violations in that DEFENDANT acted with intent to violate and to continue violating the IL Equal Pay Act and/or with reckless disregard for the matter of whether it was violating the IL Equal Pay Act.

126. Under 820 ILCS 112/30(a), if the employee demonstrates that the employer acted with malice or reckless indifference, punitive damages as may be appropriate.

127. For purposes of 820 ILCS 112/30, "date of the underpayment" means each time wages are underpaid.

**WHEREFORE, PLAINTIFF PRAYS IN RELIEF IN AN ORDER:**

A. Order a permanent injunction prohibiting DEFENDANT from further acts in violation of the IL Equal Pay Act;

B. Award PLAINTIFF back pay, reinstatement, compensatory damages, appropriate future earnings and reimbursement for income and fringe benefits lost to the present with applicable statutory interest;

C. Award PLAINTIFF costs of litigation, including reasonable attorneys' fees, expert fees, and expenses;

D. Award PLAINTIFF a judgment against DEFENDANT for liquidated damages as defined by the IL Equal Pay Act, and

E. Such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

By: ___/s/Jaz Park___
Jaz Park
Attorney for PLAINTIFF

JAZ PARK
Attorney at Law
6427 N Damen No 2E
Chicago, Illinois 60645
(872) 588-0440
jaz.park@kentlaw.edu
ARDC 6302708